UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JORGE MARES, )<br>)<br>         Plaintiff, )<br>)<br>         v. )<br>)<br>CENTURION HEALTH OF INDIANA, LLC, )<br>W. KNIGHT, )<br>COLE, )<br>FOX, )<br>GUILLEY, )<br>RENEE RANSOM, )<br>)<br>         Defendants. ) | No. 1:22-cv-00723-MPB-CSW |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Jorge Mares, an Indiana Department of Correction (IDOC) inmate, filed this civil rights action under 42 U.S.C. § 1983. His Eighth Amendment deliberate indifference claims proceed against Centurion Health of Indiana, LLC (Centurion) and Health Services Administrator Renee Ransom (medical defendants), and against Warden Knight, Deputy Wardens Cole and Fox, and Major Gilley[1] (state defendants). Dkt. 7. Both sets of defendants have moved for summary judgment. For the reasons explained below, these motions, dkts. [45] and [48], are **GRANTED.**

### I. Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable

---

[1] **The clerk is directed to update the docket** to reflect the correct spelling of the defendant's name is "Gilley."

1

to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. Factual Background

Because defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

#### 1. Plaintiff and Plaintiff's Allegations

Mr. Mares was incarcerated at Correctional Industrial Facility (CIF) at all relevant times. Dkt. 49-1 at 13 (Mares' deposition). Mr. Mares was housed in D-cellhouse, a general population

unit, in a two-person cell with a solid door with a window.[2] *Id.* at 16-17.

Mr. Mares alleges that defendants failed to follow Center for Disease Control (CDC) guidelines to prevent Covid, failed to quarantine individuals who tested positive, and failed to implement any plan or policy addressing the virus, which resulted in Mr. Mares getting sick. Dkt. 1 (Mares' complaint); dkt. 7 (screening order).

### 2. Medical Defendants

Renee Ransom was employed by Centurion as the HSA at CIF between July 2021 and July 2022. Dkt. 45-1, ¶¶ 2-3. In her role, HSA Ransom "followed general administrative direction and IDOC policies to provide overall medical support services and administrative responsibilities to the inmate healthcare program" at the facility. *Id.*, ¶ 4. HSA Ransom "had direct involvement in the provision of support services and administrative assistance for addressing Covid-19 containment at C.I.F." *Id.*, ¶ 6. She also regularly revised the facility and IDOC's Covid-19 Preparedness and Response Plan" and was aware of the "policies, customs, and procedures in place at the time of the Plaintiff's allegations to address Covid-19 containment and prevention." *Id.*, ¶ 9. HSA Ransom oversaw the implementation and enforcement of the relevant Covid Policies "which sought to reduce the spread of infection at the facility as much as possible under the circumstances presented." *Id.*, ¶ 16. She also "regularly reviewed medical records of inmates, including Mr. Mares, to provide healthcare administrative support services to support healthcare providers." *Id.*, ¶ 17. Centurion was the medical provider for the IDOC at the relevant time.

### 3. State Defendants

Defendant Wendy Knight was the Warden of CIF. Defendants Cole and Fox served as

---

[2] Mr. Mares described that the neighboring cells were separated by a wall with no gap between the ceiling and the doors, and about a three-inch gap on the floor. Dkt. 49-1 at 17. Mr. Mares estimated that the cells directly across from his were about three feet away. *Id.* at 18.

Deputy Wardens, and defendant Gilley served as a Major at CIF. Dkt. 1; dkt. 49-1 at 18. Deputy Warden Fox was specifically assigned to Mr. Mares' unit during the relevant time. Dkt. 49-3, ¶¶ 2-4. Staff assigned to Mr. Mares' unit would "regularly report any known issues" to Deputy Warden Fox "via email." *Id.*, ¶ 4. Deputy Warden Fox is familiar with the IDOC and CIF Covid Policies that were in place in 2022. *Id.*, ¶ 3.

### B. IDOC and CIF Covid Policies and Mitigation Efforts

The IDOC's Covid-19 Preparedness and Response Plan Version 5.0 (IDOC Covid Policy) was enacted on January 18, 2022, to manage infectious diseases in the IDOC.[3] Dkt. 45-1, ¶ 10-11; *see also* dkt. 45-2 at 1-16 (copy of policy).

In light of the IDOC's Covid Policy, CIF enacted "an Infectious Disease Control Plan, which established a chain of command and specific procedures for infectious disease surveillance and illness management" (CIF Covid Policy). Dkt. 45-1, ¶ 12; dkt. 45-2 at 4. CIF's illness management procedures included, among other things:

> a. surveillance and monitoring systems for disease outbreaks;
> b. identification and case classification through appropriate testing and screening;
> c. separation of inmates who have or are suspected to have infectious illnesses;
> d. social distance encouragement procedures and processes;
> e. mandatory mask/face covering during outbreaks;
> f. quarantining and limiting movement in units with a substantial number of ill or high-risk individuals;
> g. suspending transfers from intake facilities where an outbreak is present;
> h. testing of symptomatic, high risk, and close contact individuals;
> i. planning for employee shortages;
> j. planning for supply shortages;
> k. testing of released individuals and coordination with Transitional Healthcare prior to release.

Dkt. 45-2 at 5.

---

[3] State defendants note that "[b]ecause Plaintiff was unable to provide the exact date range for his allegations, Defendants' best estimate of the policy that would have been applicable at that time is the IDOC COVID Preparedness Plan V5.0, which was implemented on January 18, 2022." Dkt. 50 at 5, n.1.

The Plan also required the HSA to " arrange for the immediate evaluation and treatment of any incarcerated individual with symptoms of the prominent illness as well as those that may be asymptomatic but have had direct/close contact with an incarcerated individual or employee who is a laboratory confirmed positive case." Dkt. 45-2 at 14. Under the Polices, medical staff were responsible for screening and triaging healthcare requests forms to assess incarcerated individuals who noted symptoms of Covid. *Id.* And inmates who tested positive for Covid were to be quarantined for at least 10 days. *Id.*

To further mitigate Covid transmission, CIF took several prevention measures including implementing a procedure for screening employees. Dkt. 49-3, ¶ 8. Employees who had new or worsening Covid symptoms could not report to work until those symptoms resolved or they were symptom-free for 24 hours. *Id.*

After an outbreak, Mr. Mares' unit was put on lockdown during which inmates remained in their cells and staff were required to wear masks and personal protective equipment for one week. *Id.* Inmates in Mr. Mares' unit had mandatory Covid testing during that outbreak. *Id.* They were also provided with educational materials about preventing the transmission of Covid, soap and hand sanitizer were made available to staff and inmates, the common areas of CIF were cleaned more frequently, and CIF increased efforts to sanitize surfaces facility-wide. *Id.* Inmates who were transferred to CIF were screened for Covid and quarantined for one to two weeks. *Id.* "Medical staff made all decisions regarding whether the offender required isolation or other interventions," and if any inmates were put in quarantine, "they remained in quarantine for the full period required." *Id.*

Further, masks were given to inmates "at least every two weeks, depending on the inventory available." *Id.* Deputy Warden Fox attests that inmates had two masks and a paper sack

5

to allow the inmate to rotate the mask he was using. *Id.* ("The intention was for the offender to use one mask for a period of time, then place it in the sack and seal it for enough time to kill any virus present on the mask.").[4] Staff and inmates were able to voluntarily receive Covid vaccinations. *Id.* Social distancing was also in place to the extent possible. *Id.* Social distancing was not possible in some circumstances such as when a housing unit needed to be evacuated for sanitizing or when inmates could not be outside for long periods of time due to weather. *Id.*, ¶ 7.

Mr. Mares did not recall that he ever personally reviewed any Covid policy in place at CIF in 2022. Dkt. 49-1 at 42-45, 61 ("I don't recall, but I think—I think I read it.").

**C. Plaintiff's Testimony Related to Violations of the Covid Policies**

Mr. Mares' allegations relate to defendants' failure to abide by proper Covid protocols between January and February 2022. Dkt. 49-1 at 16. In his deposition, Mr. Mares described three incidents when he believed these alleged failures occurred. *Id.* at 19.

**1. Inmate Not Quarantined**

First, Mr. Mares testified that another inmate, "Medrano," who worked in the kitchen, became ill during the relevant time, saw medical staff, and tested positive for Covid. *Id.* at 20. Mr. Mares testified that Medrano nonetheless was sent back to their general population dorm without being quarantined away from him and the other inmates in the unit. *Id.* at 21. Medrano was taken to quarantine in another unit two days later and remained there for the quarantine period. *Id.* at 21-22. Mr. Mares testified that someone else told him about this incident because he was working at the time, and that later Medrano told him about it, but that he did not personally review

---

[4] While Mr. Mares testified in his deposition that there was some delay in receiving masks, he stated: "After like I say, a few days or a week, then we started getting [masks] regularly." Dkt. 49-1 at 38, 52. He testified that staff began wearing masks and face shields and were provided "with the helmets and white suit[s]." *Id.* at 51.

Medrano's Covid test. *Id.* at 20-22.[5] Mr. Mares was unaware of the reason for Medrano's delay in going to quarantine or if Medrano was ever tested again during the two-day period. *Id.* at 22.

### 2. Chow Hall Incident

Second, Mr. Mares testified that all of the inmates in his unit were taken to the chow hall one day during the relevant time and were made to wait there for six hours without masks. *Id.* at 19, 26. Mr. Mares did not know why they were not given masks, or if masks were not available. *Id.* at 30. He did not recall why they were taken to the chow hall. *Id.* at 28. While there, some inmates felt sick and reported it to staff and were taken for medical evaluation. *Id.* Mr. Mares testified that staff knew that "we was Covid" because Medrano had been removed from the unit, but he admitted that he did not know if any of the inmates placed in the chow hall were positive because they were not actually tested and the only indication that inmates might have been positive was because they reported to staff they were not feeling well after they were placed in the chow hall. *Id.* at 32-33.

Deputy Warden Fox attests that to his knowledge, Mr. Mares' unit was most likely moved to the chow hall for several hours in or around January or February of 2022 to allow it to be sanitized. Dkt. 49-3, ¶ 6. Inmates were moved during this process to protect them from contact with bleach and other chemicals used for cleaning. *Id.* After the cleaning was complete and the unit was safe to occupy, inmates were returned to the unit. *Id.* Deputy Warden Fox attests that the

---

[5] From Mr. Mares' deposition:

> Q. Okay. And so you said that that individual got sick. How did you know that that happened? How did you know that they were sick?
>
> A. Because you know everybody in prison. Everybody knows everything. Everybody talk.

Dkt. 49-1 at 20-21 ("I hear it from somebody else because I was working at the time . . . . Then I went back to the dorm. Then I find out . . . . Just learned it from—because he told me—when I got back, he told me that, and then like two days later, they took him.")

chow hall was largest place at CIF for inmates to be contained. *Id.*, ¶ 7. Mr. Mares testified that his unit was placed on lockdown after the chow hall incident. Dkt. 49-1 at 33.

### 3. Officer Not Sent Home

Third, Mr. Mares described an incident where non-defendant Officer Richardson, who worked on Mr. Mares' unit, was ill and was not allowed to go home. *Id.* Mr. Mares testified he was told about this incident by another inmate, "Blanco," and that the next day Officer Richardson did not show up for work because he was positive for Covid. *Id.* at 33-34. After this, Mr. Mares used the grievance process to request that employees be tested before they entered CIF. *Id.* at 34.

State defendants included Mr. Mares' related grievance documents in their designated evidence. *See* dkt. 49-4 at 1-8. Mr. Mares submitted formal grievance No. 138088 on February 1, 2022:

> On 1-10-2022 I sent an informal complaint to your office about Covid-19 omicron variant living condition. The administration was aware that on 12-29-2021 custody and staff employees were not tested before entering into work and brought this Covid-19 omicron variant into C.I.F. to the offenders. On 1-3-2022 the administration lockdown the facility 'CIF' because of this Covid-19 variant. The administration had no plan on how to quarantine offenders who had tested positive and left them mixed with the others offenders inside of the housing unit. Because of the facilities action. I become sick and I'm still dealing with side effects from this variants. Per policy of the grievance program, I am requesting to be given the next step of this policy because you did not respond to my informal step. I want facility 'C.I.F.' to test every custody and staff employee coming into this facility.

*Id.* at 6 (errors in original).

The grievance specialist, a non-defendant, responded the next day:

Offender Mares, you need to read the current grievance policy as there is no longer an informal process. As for your complaint, the Facility is following the guidelines and protocol set forth by IDOC Central Office. When an offender is displaying symptoms or reports being ill they are tested and quarantined away from other offenders if in general population. If they test positive then the dorm is placed on quarantine as well. As for testing all employees upon entrance into the facility, this is not a practical relief. At this time the facility is following the IDOC guidelines

> regarding staff wearing the proper PPE and completing the covid screening upon entering the facility daily. I can offer no further relief.

*Id.* at 4.

Mr. Mares disagreed with the response and initiated his first-level appeal on February 3, 2022. *Id.* at 3. In his appeal, Mr. Mares wrote:

> The C.I.F. facility couldn't have been following IDOC protocol for CDC Covid-19 etc . . . . Individuals tested positive . . . and were not taken to quarantine until days later. Plus D unit 2-4 side individuals were out of their cells talking and being around other offenders spreading Covid-19 . . . . Just review the camera footage for this period of time 1-3-2022 thru 1-18-2022.

*Id.* Mr. Mares received a response to his appeal four days later that appears to be signed by Warden Knight or her designee. *Id.* ("The level one response is appropriate in this matter. No further relief shall be offered.").

### D. Plaintiff's Medical Records and Interactions

Mr. Mares received his first and second dose of Pfizer vaccine on April 18 and 29, 2021. Dkt. 45-3.[6] Mr. Mares' medical record indicates that he was screened by non-defendant Nurse Halloway for Covid on January 4, 2022, that his temperature was normal, and that he denied all flu-like symptoms. Dkt. 45-4 at 1.

Between January and April 2022, Mr. Mares had several medical visits, but none of them indicated that he suffered from or reported having Covid symptoms.[7] Dkt. 45-1, ¶¶ 20-24; dkt. 45-5 (Jan. 24, 2022, chronic care visit for hypertension which was "currently stable"; denied chills, fatigue, cough, chest pain, dizziness, headache); dkt. 45-6 (Jan. 28, 2022, nurse visit for eye

---

[6] In his deposition, Mr. Mares testified he also received two booster shots of the vaccine later on. Dkt. 49-1 at 39.

[7] Fever, cough, body aches, runny nose, sore throat, lethargy, lack of appetite, new loss of taste or smell, nausea and vomiting, and diarrhea when other symptoms of upper respiratory illness noted above are also reported are the "symptoms known to be associated with infectious diseases[.]" Dkt. 45-2 at 12.

9

discharge and referred to eye doctor for evaluation); dkt. 45-7 (Feb. 7, 2022, provider visit for conjunctivitis and prescribed Maxitrol, denied chills, fatigue, fever, sinus pressure, cough, chest pain, dizziness, headache); dkt. 45-8 (Feb. 15, 2022, annual nurse well encounter, no documented Covid concerns or related symptoms reported); dkt. 45-9 (Apr. 19, 2022, chronic care visit for hypertension, no documented Covid concerns or related symptoms reported).

HSA Ransom attests that Mr. Mares could seek medical treatment through healthcare requests and was enrolled in the chronic care clinic where he was automatically scheduled to see a provider approximately every 90 days. Dkt. 45-1, ¶ 26. She attests that " Mr. Mares' medical records do not indicate that he ever sought treatment for Covid-19 infection at the time" she was HSA at the facility. *Id.*, ¶ 29 ("Between January 28, 2022, and April 11, 2022, Centurion and I, as the H.S.A., at C.I.F. took reasonable efforts to prevent the spread of Covid-19 among the inmate population[.]").

Mr. Mares testified in his deposition that he believed he contracted Covid sometime between January and February 2022 and was sick for several days with a fever and lost his sense of taste and smell.[8] Dkt. 49-1 at 35, 46. He received a Covid test but was negative. *Id.* at 46. He sent a request to the infirmary and testified that a non-defendant nurse came to check his temperature, and him he was hot because he had just gotten out of the shower. *Id.* at 35, 46-47. The nurse did not believe Mr. Mares had Covid, and Mr. Mares believed she downplayed his symptoms.[9] *Id.* at 47; dkt. 55 at 3 (Mares' affidavit). Mr. Mares testified he reported his symptoms

---

[8] In his deposition, Mr. Mares also believed he contracted Covid when he received his vaccine but said he did not know if this "counted." Dkt. 49-1 at 45. He did not test for it, but he believed he had Covid because he experienced Covid-like symptoms. *Id.*

[9] In Mr. Mares' September 5, 2023, affidavit, he states that this nurse, Nurse Halloway, "should be added as a defendant." Dkt. 65. However, Mr. Mares **cannot add defendants at summary judgment**, as his deadline to amend his pleading expired long ago. *See* dkt. 22 (deadline to amend pleadings by Mar. 2023). *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023).

to "one of the officers" but he did not remember who and that he failed to report it to anyone else because the unit was on lockdown. Dkt. 49-1 at 47.

### E. Plaintiff's Interactions with State Defendants

Deputy Warden Fox attests that he reviewed his email inbox for the relevant time—January and February 2022—for emails related to Mr. Mares' claims but "was unable to locate any messages regarding Plaintiff or any complaints he may have voiced to staff[.]" Dkt. 49-3, ¶ 4. He has no recollection of receiving emails, grievances, or correspondence about Mr. Mares' concerns about Covid protocol. *Id.* Deputy Warden Fox regularly walked the range and "had the opportunity to personally observe and/or discuss any issues occurring within D-house with offenders and/or staff," but he did not recall seeing or being told about Covid protocols not being followed. *Id.*, ¶ 5.

Mr. Mares testified in his deposition that he was suing Warden Knight because she ran CIF, and she was "supposed to tell everybody what to do." Dkt. 49-1 at 54. He testified that Warden Knight was not personally aware of the issues that are the basis of his claims because "we never—we never see her around," and because he did not speak to her directly and did not contact her directly. *Id.* at 55. Mr. Mares did not know how Deputy Warden Cole was personally aware of any of his issues. *Id.* Mr. Mares believed Deputy Warden Fox was aware "because everybody reports to him," and "a lot of people file requests and grievances," but he could not identify any specific instances where Deputy Warden Fox was on notice and admitted that he had not directly notified Fox. *Id.* at 56-57. Mr. Mares did not know how Major Gilley was aware of these issues. *Id.* at 59.

### III. Discussion

Mr. Mares allegations against the medical and state defendants implicate the Eighth Amendment.

11

### A. Eighth Amendment—Deliberate Indifference Standard

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The medical documents in the summary judgment record do not support that Mr. Mares ever tested positive for Covid. The Court will however, in the light most favorable to Mr. Mares, assume, based on his testimony that he experienced Covid symptoms, that his condition was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Mares'] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). "Deliberate indifference is more than mere negligence or carelessness: it is 'something approaching a total unconcern' for inmate safety." *Hunter v. Mueske,* 73 F.4th 561, 566 (7th Cir. 2023) (quoting *Rosario v. Brawn,* 670 F.3d 816, 821 (7th Cir. 2012)); *Huber v. Anderson,* 909 F.3d 201, 208 (7th Cir. 2018) (deliberate indifference "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.") (internal quotation omitted). Failing to choose

"the best course of action does not amount to a constitutional violation." *Peate v. McCann,* 294 F.3d 879, 882 (7th Cir. 2002).

### B. Medical Defendants

Medical defendants argue that they did not disregard a serious risk to Mr. Mares. Specifically, they argue that CIF Covid Policies were properly enforced and effectively managed the pandemic, and that Mr. Mares never had a Covid diagnosis.

#### 1. HSA Ransom

Mr. Mares has presented no evidence that HSA Ransom was aware of any of three incidents he described, nor does he show how she knew about any illness he experienced, as it is undisputed that he did not report any Covid-like symptoms to her, or any named defendant in this action. "[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago,* 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")). Because HSA Ransom was not involved in his medical care and was not aware of any of the incidents in which Mr. Mares alleges that he might have been exposed to Covid, **she is entitled to summary judgment**.

#### 2. Centurion

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of § 1983 and can be sued when their actions violate the Constitution. *Dean*, 18 F.4th at 235 (citing *Monell*

13

*v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). To state a *Monell* claim, Mr. Mares must identify an action taken by Centurion and allege a causal link between that action and the deprivation of his federal rights. *Dean,* 18 F.4th at 235.

"A municipality 'acts' through its written policies, widespread practices or customs, and the acts of a final decisionmaker." *Levy v. Marion Co. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019). "If a municipality's action is not facially unconstitutional, the plaintiff 'must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences.'" *Id.* "[C]*onsiderably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation." *Id.* (cleaned up) (emphasis in *Dean*). Finally, the plaintiff must show a direct causal link between the municipality's action and the deprivation of federal rights. *Id*. Here, Mr. Mares has identified no facially unconstitutional Centurion policy. To the extent that he is challenging a facially lawful policy, Mr. Mares must provide evidence of a "pattern of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). He must further show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up). Mr. Mares failed to demonstrate either. He has designated no evidence of any Centurion policy that caused multiple injuries or a pattern of similar violations. Centurion is therefore **entitled to summary judgment**.

### C. State Defendants

State defendants argue that they were not personally involved in the alleged constitutional

deprivations, that they are entitled to qualified immunity,[10] that the official capacity claim against Warden Knight is barred by the Eleventh Amendment, and that they were not deliberately indifferent. Dkt. 50 at 1.

"Non-medical defendants cannot simply ignore an inmate's plight." *Arnett v. Webster,* 658 F.3d 742, 755 (7th Cir. 2011). Where there is an excessive risk to inmate health or safety, "[o]nce an official is alerted of such a risk, the 'refusal or declination to exercise the authority of his or her office may reflect deliberate disregard.'" *Arnett,* 658 F.3d at 756 (quoting *Vance v. Peters,* 97 F.3d 987, 993 (7th Cir. 1996)).

### 1. Defendants Cole, Fox, and Gilley

Mr. Mares has designated no evidence to support that Deputy Wardens Cole and Fox or Major Gilley were aware of his complaints of any of the issues raised in this action, nor has he designated any evidence that these defendants were aware that he experienced any symptoms of Covid. *See, e.g., Colbert*, 851 F.3d at 657 (individual liability). Further, the record does not indicate any such evidence, therefore summary judgment in favor of these defendants is appropriate. Accordingly, **these defendants are entitled to summary judgment**.

### 2. Warden Knight

Mr. Mares admits that he never spoke to or contacted Warden Knight directly. Dkt. 49-1 at 55. The summary judgment record indicates that Warden Knight may have responded to Mr. Mares' level-one appeal related to his complaints that individuals were not taken to quarantine until days later and that individuals were allowed to be out of their cells congregating and spreading

---

[10] As the Court will discuss, there is no evidence to support that state defendants violated Mr. Mares' Eighth Amendment rights, as the Court finds these defendants did not have sufficient personal involvement. Therefore, the Court need not address qualified immunity that those rights were not clearly established. *See, e.g., Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1057-58 (7th Cir. 2011) (where there is no constitutional violation, defendants "do not require the additional protection of qualified immunity").

Covid. *See* dkt. 49-4 at 3 (signature of Warden/designee dated Feb. 7, 2022).

Assuming that Warden Knight responded to Mr. Mares' level-one appeal, this is not enough to establish personal liability. Whether supervisory personnel at a prison are sufficiently involved in an alleged constitutional violation such that they may be liable for damages often depends on that person's knowledge of, and responsibilities regarding, the alleged harm. Mere "knowledge of a subordinate's misconduct is not enough for liability." *Vance v. Rumsfeld,* 701 F.3d 193, 203 (7th Cir. 2012) (en banc). Indeed, "inaction following receipt of a complaint about someone else's conduct is [insufficient]." *Estate of Miller by Chassie v. Marberry,* 847 F. 3d 425, 428 (7th Cir. 2017). If upon learning of an inmate's complaints, a prison official reasonably responds to those complaints, the prison official lacks a "sufficiently culpable state of mind" to be deliberately indifferent. *See Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006) (finding grievance counselor did not violate the Eighth Amendment where he researched inmate's complaint and learned medical professionals had seen and diagnosed patient); *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002) ("Even if he recognizes substantial risk [to an inmate's health or safety], an official is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" (quoting *Farmer*, 511 U.S. at 843). Mr. Mares had requested through his formal grievance that CIF test every employee everyday prior to their entering the facility. Dkt. 49-4 at 6. The Warden or her designee simply concurred with the grievance specialist's reasonable response that the facility was following guidelines set by the IDOC Central Office and testing all employees upon entrance was not a practical form of relief. *Id.* at 1-8.

Related to any of Mr. Mares' issues about quarantine or medical interventions, it is undisputed that medical staff made those decisions. Dkt. 49-3, ¶ 8. Non-medical officials are entitled to rely on medical professionals' opinions. *See, e.g., Perez v. Byrd*, No. 2:20-cv-00595-

JMS-DLP, 2022 WL 2479170, at *5 (S.D. Ind. July 6, 2022) (citing *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) affirming the grant of summary judgment to non-medical defendants where they investigated the prisoner's complaints, sought guidance from medical officials, and relied on the judgment of prison physicians)).

Mr. Mares has not designated any evidence that Warden Knight had any other direct involvement in the issues in his complaint. Because no reasonable juror could find that Warden Knight was deliberately indifferent to Mr. Mares' needs, she is **entitled to summary judgment.** In addition, Warden Knight is **entitled to summary judgment on any official capacity claims** against her. Any claim against Warden Knight in her official capacity is against the State of Indiana, which is not a person subject to suit under § 1983. *See Kreilein v. Horth*, 854 F. App'x 733, 734 (7th Cir. 2021) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65–66 (1989)).

## IV. Conclusion

For the reasons set forth above, the medical and state defendants' motions for summary judgment, dkts. [45] and [48], are **GRANTED**. Final judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Dated: March 15, 2024

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

Distribution:

JORGE MARES
270318
WESTVILLE - CF
WESTVILLE CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel